## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                  )
RITA MARTINS, individually and on behalf          )
of all others similarly situated,                 )
                                                  )
                    Plaintiffs,                   )
                                                  )
            v.                                    )          Civil Action No. 1:24-cv-10357-MJJ
                                                  )
CAPSTONE LOGISTICS, LLC                           )
                                                  )
                    Defendant.                    )
_____           )

## MEMORANDUM OF DECISION

January 30, 2026

**JOUN, D.J.**

Defendant Capstone Logistics, LLC ("Capstone") has renewed its motion to compel arbitration, [Doc. No. 47], and its motion to transfer this matter to the United States District Court for the District of Delaware, [Doc. No. 49]. Plaintiff Rita Martins ("Martins") opposes. For the reasons set forth below, Capstone's motion to compel arbitration, [Doc. No. 47], is <u>DENIED</u> and its motion to transfer, [Doc. No. 49], is <u>GRANTED</u>.

## I.    BACKGROUND

### A.    <u>Procedural History</u>

Martins filed her complaint on February 14, 2024. *See generally* [Doc. No. 1]. On April 22, 2024, Capstone responded by concurrently filing a motion to compel arbitration, [Doc. No. 10], and a motion to transfer this matter to the United States District Court for the District of Delaware, [Doc. No. 8]. Capstone seeks to compel arbitration and to transfer forums by enforcing

1

one or more agreements to which neither Capstone nor Martins are named parties. *See generally* [Doc. Nos. 8–11]. At a March 13, 2025 status conference, I explained that limited discovery was needed to provide clarity about the relationships between the various entities referenced in the filings before I could resolve the motions. *See* [Doc. Nos. 36–37]. I denied the motions without prejudice and granted permission to refile upon completion of the limited discovery. [Doc. Nos. 36–37]. In accord, Capstone renewed both motions on September 4, 2025. [Doc. Nos. 47 and 49]. On December 30, 2025, Martins filed a notice of supplemental authorities in support of her opposition to the motion to compel. [Doc. No. 59]. Capstone filed a response to that notice on January 5, 2026. [Doc. No. 60].

**B.    <u>Relevant Actors</u>**

The key evidence in the motions pending before me are two contracts, neither of which explicitly identifies Capstone or Martins as a party to the agreement. Consequently, to make sense of these motions, one must first understand who the relevant actors are and how they relate to one another.

The defendant in this matter, Capstone, is a third-party logistics company that provides product delivery services to companies that outsource the transportation and delivery aspects of their supply chain. [Doc. No. 11-1 at ¶ 2]. Capstone operates in 46 states throughout the country and has subsidiary companies that assist with its delivery services. [Doc. No. 50 at 6]. Priority Express, LLC ("Priority Express") is one such subsidiary company. [*Id.*] Contractor Management Services, LLC dba Openforce ("Openforce") is a third-party entity that provides administrative services like payroll processing to Capstone and its delivery drivers. [Doc. No. 48 at 6].

The plaintiff in this matter, Martins, worked as a delivery driver in Massachusetts from at least November 2022 until September 2023. [Doc. No. 48-1 at 6; Doc. No. 53 at 2]. Martins alleges

that she was employed by Capstone via her company Overcomer LLC ("Overcomer"). *See* [Doc. No. 53 at 2; Doc. No. 48 at 6].

Priority Express, Openforce, and Overcomer are not named parties to this litigation, but they are the explicitly named contracting parties in the aforementioned agreements.

## C.    <u>Factual Background</u>

Martins worked as a delivery driver in Massachusetts from at least November 2022 until September 2023. [Doc. No. 48-1 at 6; Doc. No. 53 at 2]. The parties disagree whether Martins was employed by Capstone or its subsidiary Priority Express during that time.

Martins asserts that she was employed by Capstone. [Doc. No. 1 at ¶ 1; Doc. No. 53 at 2]. She testified that she responded to an online job advertisement posted by Capstone and then interviewed at a Capstone facility with a Capstone employee. [Doc. No. 48-1 at 6–8]. That same Capstone employee then served as her on-site manager once she was hired as a delivery driver, and she was required to wear a Capstone uniform while making deliveries. [*Id.* at 6, 9, 12, 14; Doc. No. 53-2 at 1]. Her on-site manager informed her that she was required to form a corporate entity to get paid for the work she'd performed for Capstone, and Martins formed Overcomer as a result. [Doc. No. 48-1 at 6, 8–9].

Capstone argues that Capstone and Priority Express are independent entities and that Martins was employed by the latter. *See* [Doc. No. 48 at 6 n. 2] ("Martins, through her company Overcomer LLC, provided delivery services through one of Capstone's subsidiaries, Priority Express, LLC."); [Doc. No. 50 at 6] ("Despite being a subsidiary of Capstone, Priority Express operates as an independent entity."). Capstone alleges that "Priority Express exercises this operational independence by choosing to contract with individuals or business entities . . . [and]

enters into Independent Contractor Operating Agreements with individuals or business entities that outline the relationship between the parties." [Doc. No. 50 at 6].

Nevertheless, Capstone admits that it "is part of the same corporate structure as Priority Express" and that Priority Express "operate[s] as Capstone Logistics' last mile fulfillment solution." [Doc. No. 50 at 17; Doc. No. 53-7 at 1]. Capstone concedes that the two entities are "closely related," share interests, and operate as one "interconnected entity . . . to accelerate growth within the last mile sector." *See* [Doc. No. 50 at 17; Doc. No. 53-7 at 1]. Capstone also admits that Martins "enter[ed] into the [Priority Express Operating] Agreement on her own behalf *with Capstone*" and that "she could not have provided services *for Capstone* had she not signed the agreement her company entered into with Capstone's subsidiary." [Doc. No. 50 at 17–28] (emphasis added); *see also* [Doc. No. 48 at 6] (emphasis added) ("Through a company owned by Martins and her husband, Overcomer LLC, Plaintiff Martins provided the vehicle and labor needed *to deliver Capstone's customers' product*.").

The parties agree that Martins began working as a delivery driver prior to signing any agreements. [Doc. No. 48 at 6; Doc. No. 53 at 4]. After several weeks, her on-site manager notified her that she needed to sign certain documents to receive payment for the work she had been performing. [Doc. No. 53 at 4]. Martins testified that she received this instruction while she was driving and was directed to electronically sign various documents via her cell phone. [Doc. No. 48-1 at 14–15]. During that occurrence, Martins signed at least two agreements. [*Id.*]. She explained that she accessed the agreements through Capstone's online portal and signed both without reading them, noting that both agreements were made accessible to her in the portal at the same time and signed on the same day (*i.e.*, November 21, 2022). [*Id.*]. She could not, however, remember the order in which the agreements were signed. [*Id.*].

4

One of the agreements Martins signed is titled "Independent Contractor Operating Agreement" (hereinafter, the "Priority Express Operating Agreement"). [Doc. No. 9-1 at 6]. The Priority Express Operating Agreement states in its preamble that the parties entering into the contract are the undersigned motor carrier and contractor. *See* [*id.*] ("The undersigned motor carrier ('Carrier') and the undersigned contractor ('Contractor'), pursuant to 49 C.F.R. Part 376, enter into this … Agreement, including any appendices and addendums…."). The signature block then identifies Priority Express as the motor carrier and Overcomer as the contractor. [*Id.* at 16]. Although Martins signed the Priority Express Operating Agreement on behalf of Overcomer, she is not identified as a party to the agreement in her individual capacity. *See* [*id.*]. Capstone is not referenced anywhere in the agreement.[1] *See generally* [*id.*] The same is true of the incorporated and signed appendices and schedules. *See* [*id.* at 20, 24, 25]. The Priority Express Operating Agreement states that it does not create "any rights in any party not a signatory to or expressly designated as a third-party beneficiary herein." [*Id.* at 14]. In addition, it contains an arbitration provision, a forum selection clause, and a choice of laws provision. [*Id.*].

The arbitration provision in the Priority Express Operating Agreement incorporates an arbitration agreement (hereinafter, the "Priority Express Arbitration Agreement"). *See* [Doc. No. 9-1 at 14; Doc. No. 24-1]. The parties to the Priority Express Arbitration Agreement are Priority Express and Overcomer. [Doc. No. 24-1 at 1, 5]. Martins signed the Priority Express Arbitration Agreement on behalf of Overcomer but is not identified as a party to the agreement in her

---

[1] Martins alleges that "Capstone is identified twice in the Priority Express [Operating A]greement," [Doc. No. 53 at 8–9], but fails to provide citation to either identification, and I do not see any such identification. I note, however, that Dave Charron, Senior VP of Operations, signed the Priority Express Operating Agreement on behalf of Priority Express. [Doc. No. 9-1 at 16]. According to publicly available information, Mr. Charron appears to be employed by Capstone, not Priority Express. *See* Dave Charron, LINKEDIN, https://www.linkedin.com/in/dave-charron-b149317/ (last accessed Jan. 30, 2026) (alleging to have worked as Senior VP of Operations for Capstone for the past 16 years).

individual capacity. *See* [*id.* at 5]. Capstone is not referenced anywhere in the agreement.[2] *See generally* [*id.*].

The other agreement Martins signed is titled "Carrier TPA Services Agreement" (hereinafter, the "Openforce TPA Agreement"). [Doc. No. 11-1 at 6]. The Openforce TPA Agreement explicitly states in its preamble that the parties entering into the contract are Openforce and Overcomer. *See* [*id.*] ("THIS CARRIER TPA SERVICES AGREEMENT ('Agreement') is made the 21 day of November, 2022, by and between Contractor Management Services, LLC dba Openforce, hereafter referred to as 'Openforce' and Overcomer LLC hereafter referred to as 'Carrier' . . . ."). Although Martins signed the Openforce TPA Agreement on behalf of Overcomer, she is not identified as a party to the agreement in her individual capacity. *See* [*id.* at 19]. Likewise, Capstone is not expressly identified anywhere in the Openforce TPA Agreement. *See generally* [*id.*].

The Openforce TPA Agreement incorporates "Schedule A," "Schedule B," and a "Carrier Summary / 24 Points of Understanding." [*Id.* at 17]. The Carrier Summary / 24 Points of Understanding purports to assist carriers by summarizing the "advantages and obligations" delineated in the Openforce TPA Agreement and incorporated schedules. [*Id.* at 20]. Although Martins is listed as the signatory on the Carrier Summary / 24 Points of Understanding, she signed on behalf of Overcomer and not in her individual capacity. *See* [*id.* at 23]. Capstone is not expressly identified anywhere in this document either. *See generally* [*id.*].

Schedule A lists optional programs and services (such as life insurance) that Overcomer may choose to participate in and for which Openforce would facilitate payment processing, but it does not require a party's signature. *See* [*id.* at 15, 23–24].

---

[2] Dave Charron signed the Priority Express Arbitration Agreement on behalf of Priority Express. [Doc. No. 24-1 at 5].

Schedule B is an arbitration agreement (hereinafter, the "Schedule B Arbitration Agreement"). [*Id.* at 25–28]. The preamble of the Schedule B Arbitration Agreement identifies the parties to the agreement as Overcomer and Openforce. [*Id.* at 25] ("This Arbitration Agreement is between OVERCOMER LLC ('Carrier'), on the one hand, and Contractor Management Services, LLC dba Openforce ('Openforce'), on the other hand."). However, the signature block to the Schedule B Arbitration Agreement contains an acknowledgment that the terms of the arbitration agreement will apply not only to the Carrier (*i.e.*, Overcomer) but also to the Carrier's agent (*i.e.*, Martins) in her individual capacity. [*Id.* at 28] ("I hereby certify that I have read the above Arbitration Agreement and understand that it will apply to Carrier and personally to me, unless I choose to opt-out as explained above."). The Schedule B Arbitration Agreement purports to provide instructions for both the Carrier and its agent to opt out. *See* [*id.* at 27]. Though I note that the instructions fail to provide a mailing address for delivery of the required opt-out notice, the point is moot because Martins does not allege that she or Overcomer ever attempted to opt out. *See* [*id.*]; *see generally* [Doc. No. 53]. Finally, Capstone is not referenced anywhere in the Schedule B Arbitration Agreement. *See generally* [*id.* at 25–28].

## II.   LEGAL STANDARD

Capstone seeks to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA") and to transfer forums pursuant to 28 U.S.C. § 1404(a).

Section 4 of the FAA prescribes the basis for court review of motions to compel arbitration: "The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration … is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement…. If the making of the arbitration agreement … be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4.

Where, as is the case here, the parties have submitted evidence alongside their pleadings, "district courts should apply the summary judgment standard to evaluate motions to compel arbitration under the FAA." *Air-Con, Inc. v. Daikin Applied Lat. Am., LLC*, 21 F.4th 168, 175 (1st Cir. 2021). "Pursuant to the summary judgment standard, the court must construe the record in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. If the non-moving party puts forward materials that create a genuine issue of fact about a dispute's arbitrability, the district court 'shall proceed summarily' to trial to resolve that question." *Id.* (citations omitted). In ruling on a motion to compel arbitration, a court may consider "evidentiary materials – including materials beyond those attached to the pleadings – in support of and opposition to a motion to compel arbitration." *Id.* at 175. "[T]he non-moving party's burden 'to offer evidence supporting its own case' does not arise 'unless the moving party meets its initial burden' of production." *Id.* at 177 (citation omitted).

Pursuant to Section 1404(a), a district court may transfer a civil action to any other district or division to which all parties have consented or to any other district or divisions where the action may have been brought "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). "While a plaintiff's choice of forum is ordinarily entitled to some deference, the calculus fundamentally changes in the presence of a valid forum-selection clause. Accordingly, a proper application of § 1404(a) requires that a forum-selection clause be given controlling weight in all but the most exceptional cases. In addition, the plaintiff, as the party defying the forum-selection clause, has the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Kaymbu, Inc. v. HighScope Educ., Research Foundation*, No. 23-cv-11245, 2023 WL 4409518, at *1 (D. Mass. July 7, 2023) (citations and quotations omitted). Forum-selection clauses are "prima-facie valid" and should not be set aside unless the opposing party

makes a "strong showing" that the clause is "unreasonable under the circumstances." *Claudio-de Leon v. Sistema Universitario Ana G. Mendez*, 775 F.3d 41, 48 (1st Cir. 2014) (citations omitted).

## III.  DISCUSSION

Capstone and Martins "agree that the Court must rule on the pending motion to compel arbitration prior to reaching the transfer motion." [Doc. No. 51 at 4 n.3; Doc. No. 50 at 5 n.2].

### A.     Capstone's Motion to Compel

Capstone moves to compel arbitration through enforcement of the Openforce TPA Agreement.[3] *See generally* [Doc. No. 48]. The Openforce TPA Agreement incorporates the Schedule B Arbitration Agreement, which is governed by the FAA. *See* [Doc. No. 11-1 at 25] ("The Parties agree that this [Schedule B] Arbitration Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1, et seq. to the greatest extent permitted by law."). Martins argues, and Capstone does not dispute, that Martins cannot be compelled to arbitrate if she is deemed exempt from the reach of the FAA. [Doc. No. 53 at 20] ("In the Absence of the FAA, Massachusetts Law Prohibits Arbitration"); *see generally* [Doc. No. 58] (neglecting to address the argument). Thus, I begin my inquiry with the applicability of the FAA. *See New Prime Inc. v. Oliveira*, 586 U.S. 105, 111 (2019) (explaining that a court must first determine whether the FAA applies before invoking the power authorized by the FAA to compel arbitration).

Section 1 of the FAA limits a court's authority to compel arbitration by exempting from the FAA's reach "contracts of employment of seamen, railroad employees, or any other class of

---

[3] Even though both the Openforce TPA Agreement and the Priority Express Operating Agreement contain arbitration provisions, Capstone moves to compel arbitration through enforcement of only the former agreement. *See* [Doc. No. 48 at 6 n.2]. Capstone does not explain why it does not seek to compel arbitration pursuant to the Priority Express Operating Agreement, but I agree with Martins that "[i]t is likely that Capstone is submitting the Openforce [TPA] Agreement because it knows that the real agreement with Ms. Martins (i.e., the [Priority Express] Operating Agreement) is exempt from the FAA." [Doc. No. 53 at 7 n.6].

workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. The parties agree that Martins

falls within an accepted "class of workers engaged in foreign or interstate commerce" as required

by the exemption. *See generally* [Doc. Nos. 48, 53, 58]; *see also Circuit City Stores, Inc. v. Adams*,

532 U.S. 105, 119 (2001) ("Section 1 exempts from the FAA only contracts of employment of

transportation workers."). The parties also agree that the Schedule B Arbitration Agreement,

standing alone, is not a contract of employment. *See generally* [Doc. Nos. 48, 53, 58]; *see also*

*Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 121 (2d Cir. 2010) (citing *Gilmer v.*

*Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 n.2 (1991)) ("[T]he Supreme Court has strongly

suggested that [standalone] arbitration agreements such as the one at issue in this case do not

constitute 'contracts of employment' where the arbitration agreement is 'not contained' in a

broader employment agreement between the parties . . . ."). Consequently, the applicability of the

FAA turns on two issues: first, whether the aforementioned agreements constitute a comprehensive

contract of employment, and, second, whether business entities may create a contract of

employment.

      Martins, as the party resisting arbitration, bears the burden of proving that she is exempt

under Section 1. *See Neims v. Neovia Logistics Dist., LP*, No. No. 23-cv-00716, 2023 WL

6369780, at *3 (C.D. Cal. Aug. 10, 2023) (citing *Rogers v. Royal Caribbean Cruise Line*, 547 F.3d

1148, 1151 (9th Cir. 2008)). For the reasons set forth below, Martins has satisfied this burden and

the motion to compel is denied.

      **1.**     **The Schedule B Arbitration Agreement is Part of Martins'**
              **Comprehensive Contract of Employment**

      Martins argues that the Openforce TPA Agreement, which explicitly incorporates the

Schedule B Arbitration Agreement, is a contract of employment within the meaning of Section 1.

She alleges without citation that "[t]he Openforce [TPA A]greement clearly states that Openforce

10

is acting an [sic] 'agent' to sign-up Carriers such as Ms. Martins to perform 'carrier services,' i.e. transportation of products." [Doc. No. 53 at 19]. She then alleges that the contract "states repeatedly that the Carrier will be performing carrier services and transportation services 'hereunder,' and sets for how Ms. Martins was paid. Thus, the contract is one to perform work . . . ." *See* [*id.*] (citation omitted); *see also* [*id.* at 5 n.4].

Martins' arguments rest on the mistaken premises that the Openforce TPA Agreement is a contract of employment simply because it involves an independent contractor and because Martins is a transportation worker. *See* [*id.* at 9–10, 19] (citing the Supreme Court's decision in *New Prime* clarifying that the term "contract of employment" is not limited to contracts involving an "employee" and may be expanded to include contracts with independent contractors); [*id.* at 19] (conflating the First Circuit's instruction in *Fraga* to focus "on what the worker does …, not what the company does" when determining whether an individual belongs to an accepted class of worker with the analysis for determining whether a contract is an employment agreement). But merely identifying a party to an agreement as an independent contractor and noting the parties' relationship to the transportation industry is insufficient to exempt that agreement from the FAA.

The Supreme Court explicitly rejected such classification-based assessments for determining applicability of the FAA in *New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019). There, the Court addressed whether the term "contracts of employment" is limited to contracts between employers and employees or if it also encompasses contracts with independent contractors. *See New Prime Inc.*, 586 U.S. at 116–21. In doing so, the Court rejected an attempt to "shift the debate from the term 'contracts of employment' to the word 'employee.'" *Id.* at 116. The Court acknowledged that the law today "often distinguishes between employees and independent contractors," but it found that such differences are not relevant because "words generally should

be interpreted as taking their ordinary meaning at the time Congress enacted the statute." *See id.* at 113, 116 (citations omitted). The Court held that "[w]hen Congress enacted the [FAA] in 1925, the term 'contracts of employment' referred to agreements to perform work." *Id.* at 121.

Under this guidance, a traditional employment agreement—"under which the employer has the right to control the details of work performance"—and a contractor agreement—under which the worker is "left free to do the assigned work and to choose the method for accomplishing it"— both constitute a "contract of employment." *Id.* at 116–17; *see id.* at 116 ("Congress used the term 'contracts of employment' in a broad sense to capture any contract for the performance of *work* by *workers*.") (emphasis in original). Accordingly, there is no one-size-fits-all approach for identifying a contract of employment. Instead, courts must substantively analyze whether a contract is an "agreement to perform work." *See id.* at 114.

Here, the Openforce TPA Agreement expressly disclaims that it is an agreement to perform delivery services for Openforce. *See* [Doc. No. 11-1 at 6] ("[Openforce] shall not be construed to be a transportation broker or freight forwarder with respect to its relationships with the Logistics Provider or Carrier in that [Openforce] does not arrange for the transportation of property as defined in 49 U.S.C. §13102(2) and no transportation services are provided at the request of [Openforce]."). It also states that any transportation and delivery services fall under the purview of the Logistics Provider and Carrier and are governed by a services agreement executed between them. [*Id.* at 6] ("'CSA' means an agreement … between a Logistics Provider and an authorized Carrier to provide transportation services supplied by such Carriers ('Carrier Services')."); [*id.* at 7] ("Carrier desires to contract with one or more Logistics Provider(s) to provide Carrier Services under a separate CSA executed between such Logistics Provider and Carrier."); [*id.*] ("[T]he Parties intend by this Agreement for Carrier … to provide transportation services to specific

12

Logistics Provider(s)…."); [*id.* at 7-8] ("Carrier warrants and represents … [t]hat it will enter into and maintain a written CSA with any Logistics Providers utilizing the Openforce platform that Carrier intends to provide transportation services to.").

Nevertheless, the Openforce TPA Agreement touches on several aspects of Martins' work as a delivery driver. The agreement discusses the Carrier's "exclusive control over … their own routes or the order of the deliveries," "conditions" for payment, and the Carrier's discretion "to accept or reject assignments." [Doc. No. 11-1 at 14–15]. It also mentions "Openforce's [r]ight to [d]educt and [o]ffset" various costs, requires the Carrier to comply with safety laws and regulations with respect to "the services provided by Carrier under this Agreement and its CSA with the Logistics Provider," and, among other things, requires the Carrier to obtain insurance and use its own vehicles. [*Id.* at 7, 10–11, 16] (emphasis added).

Although the Openforce TPA Agreement refers to several aspects of Martin's employment as a delivery driver, it is not itself an agreement to perform those services. The Openforce TPA Agreement clarifies that Openforce is merely a vehicle through which a Carrier and Logistics Provider may settle payments. *See* [*id.* at 7] ("[T]he Parties intend by this Agreement … to facilitate and provide the Carrier with settlement payment services and related business services."). An agreement concerning payment for services may naturally touch upon those services, but that does not make it an agreement to perform the work discussed therein. *See* [*id.* at 6-7] ("'Third Party Administrator' or 'TPA' means a business that helps procure, qualify, and support carriers in their operation of motor vehicles for carrier services and provides products and administrative services, such as settlement payment services, to both Carriers and Logistics Providers . . . Openforce is a Third Party Administrator or TPA").

13

Relevant here, a Carrier does not promise to perform delivery services under this agreement. Rather, compensation is set by the Carrier and Logistics Provider, not Openforce as the third-party administrator; and Openforce does not assign any deliveries to Carriers. [*Id.* at 6] ("[N]o transportation services are provided at the request of [Openforce]."); [*id.* at 14] ("Carrier shall be paid a fee based on the schedule of rates Carrier negotiates with the Logistics Provider, which rates will be specified and solely determined as between the Carrier and the Logistics Provider in an applicable CSA and/or related CSA rate agreement and/or rate sheet."); [*id.* at 15] ("Carrier may … accept or reject assignments from Logistics Providers. Carrier will be notified of any assignment by the agreed upon means of communication with applicable Logistics Providers."); [*id.* at 21] ("Openforce is not involved in negotiating rates."). The Openforce TPA Agreement is not a contract of employment but an agreement for payment services in furtherance of a contract of employment.

However, the inquiry does not end here. Martins also argues that the Schedule B Arbitration Agreement is "part and parcel of Ms. Martin's work relationship with Capstone" because she "signed it the same day that she signed her [Priority Express Operating Agreement], and was told that she had to sign all of these documents in order to get paid." [Doc. No. 53 at 13]. Martins cites a handful of cases from other district courts holding that multiple stand-alone agreements may be construed as a single contract when they are closely interconnected and executed as part of the same transaction. *See* [*id.* at 13] (collecting cases); *see also Gabay v. Roadway Movers, Inc.*, 671 F. Supp. 3d 371, 382 (S.D.N.Y. 2023) (finding that a collection of agreements, "as a whole" show that plaintiff has an employment contract "that included the terms and conditions of his employment"); *Abram v. C.R. England, Inc.*, No. 20-cv-00764, 2020 WL 5077365, at *3 (C.D. Cal. Apr. 15, 2020) (finding arbitration agreement part of the

"comprehensive" contract of employment because it was presented to plaintiff at the same time as the employment contract and "covers a broad range of claims, including employment-related disputes"); *Fuqua v. Kenan Advantage Grp, Inc.*, No. 11-cv-01463, 2012 WL 28611613, at *5 (D. Or. Apr. 13, 2012) (construing arbitration agreement as part of the contract of employment where the two documents were presented simultaneously, stored together, and addressed employment-related issues).

Capstone makes no effort to defeat this argument other than by stating that Martins' cases "are inapposite because they do not address Capstone's argument (and the reasoning under *Cuneo*) that the [Openforce TPA Agreement], like the agreement in *Cuneo*, is not a contract of employment…." [Doc. No. 58 at 8 n.6]. But whether the Openforce TPA Agreement is a contract of employment is irrelevant to whether that agreement, and by incorporation the Schedule B Arbitration Agreement, may be construed to be encompassed by the Priority Express Operating Agreement. And, in any event, I agree with Martins.

Numerous courts, including those in Delaware, Arizona, and Massachusetts, have held that the relevant inquiry is whether the circumstances of the transaction establish that the arbitration agreement is part of an agreement to perform work.[4] S*ee Florida Chemical Co., LLC v. Flotek Indus., Inc.*, 262 A.3d 1066, 1081 (Del. Ch. 2021) (citations omitted) ("As a matter of black letter law, 'all writings that are part of the same transaction are interpreted together.' Delaware follows this principle and holds that, as a general rule, 'contemporaneous contracts between the same parties concerning the same subject matter should be read together as one contract.'"); *Weiss v. DHL Exp., Inc.*, 718 F.3d 39, 45 (1st Cir. 2013) (citation omitted) (applying Massachusetts law: "[W]hen several writings evidence a single contract or comprise constituent parts of a single

---

[4] The Openforce TPA Agreement is governed by Arizona state law. [Doc. No. 11-1 at 17]. The Priority Express Operating Agreement is governed by Delaware state law. [Doc. No. 9-1 at 14].

transaction, they will be read together."); *Farname Cos., Inc. v. Stabar Enter., Inc.*, No. 03-cv-00503, 2005 WL 3369473, at *6 (D. Ariz. Dec. 12, 2005) ("Where multiple contracts are part of the same transaction, they are understood and read together."). Even though the cases Martins cites are factually distinguishable—either because the employment contract seems to reference the stand-alone arbitration agreement or because the series of agreements were executed between the same parties—the circumstances surrounding the execution of the agreements justifies the same result.

Here, Capstone purportedly sought out, interviewed, and hired Martins. *See* Section 1.C (explaining that Martins applied to a Capstone job posting, interviewed with a Capstone employee who eventually became her manager, and wore a Capstone uniform while making deliveries). Capstone presented Martins with the written contracts at the same time, and it did so by uploading the documents to Capstone's online portal. [Doc. No. 48-1 at 17]. Even though a director at Capstone testified that "[t]here is no requirement that independent contractors … enter into [an Openforce TPA Agreement]," it is undisputed that Martins' manager informed her that she "needed to sign these documents in order to get paid." [Doc. No. 11-1 at 4; Doc. No. 48-1 at 17].

Furthermore, the Openforce TPA Agreement acknowledges that it arises out of Martins' performance of carrier services to Priority Express and thus Capstone. *See* [Doc. No. 11-1 at 7–8] ("WHEREAS, the Parties intend by this [Openforce TPA] Agreement for the Carrier … to enter into and maintain CSA(s) to provide transportation services to specific Logistics Provider(s).… Carrier warrants and represents … [t]hat it will enter into and maintain a written CSA with any Logistics Providers.…"). And the Schedule B Arbitration Agreement encompasses employment-related issues with the Logistics Provider, such as wages, compensation, and employment

classification. [*Id.* at 25] (covering disputes "regarding or relating to wages … compensation … allegations of 'misclassification' or 'employee' status … uniform maintenance….").

Additionally, Priority Express and Openforce both serve Capstone. Priority Express "operate[s] as Capstone Logistics' last mile fulfillment solution," and Capstone itself has described its relationship with Priority Express as creating an "interconnected entity." [Doc. No. 53-7 at 1]. Similarly, according to Capstone, "Capstone utilizes Openforce to provide administrative services … to independent contractors that Capstone contracts with to perform deliveries" and Capstone maintains copies of the executed Openforce TPA Agreements in the regular course of its business. [Doc. No. 11-1 at 3–4].

Therefore, even though the written agreements were signed by different parties, none of which are Capstone, the overlapping substance of those agreements; the fact that one agreement refers, at least implicitly, to the other; and the circumstances surrounding their contemporaneous execution justify treating them as a collective contract of employment, particularly where Capstone has failed to substantively challenge such an argument.

The fact that "[t]he integration provision in the Priority Express Agreement states that the agreement 'constitutes the entire agreement between [Priority Express] and [Overcomer]'" does not warrant a different outcome. *See* [Doc. No. 58 at 3]; *Silva v. Cross Country Healthcare, Inc.*, 111 Cal.App.5th 1311, 1326 (2025) ("We reject [defendant's] related argument that the existence of an integration clause in the Employment Agreement precludes reading the two agreements in tandem: Although the inclusion of an integration clause weighs against reading contracts together, it does not preclude [reading the agreements together]. Where the contract being construed (here, the Arbitration Agreement) is not the one containing the integration clause and hence not the contract purporting to embody the sum total of the parties' agreement, substantial evidence

supports the trial court's decision to read the Arbitration Agreement in conjunction with the Employment Agreement.").

### 2. Contracts of Employment May Be Executed Between Business Entities

Capstone argues that an agreement executed between business entities cannot be a contract of employment with the meaning of Section 1. *See* [Doc. No. 48 at 15–16; Doc. No. 58 at 5–7]. It relies primarily on the Ninth Circuit's holding in *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190 (9th Cir. 2024). *See* [Doc. No. 48 at 15–16; Doc. No. 58 at 5–7]. The Ninth Circuit addressed this question head on and established a bright-line rule that "Section 1 of the FAA does not extend to corporate entities or to commercial contracts." *Fli-Lo Falcon, LLC*, 97 F.4th at 1194. The Ninth Circuit reasoned that the residual category in Section 1, "any other class of workers," must be afforded a narrow construction limited to natural persons because statutory construction requires that the phrase embrace a similar scope as the preceding terms in the list, "seamen" and "railroad employees," which refer to natural persons. *See id.* at 1195–96. That court emphasized that "[s]izable corporate entities are not 'similar in nature' to the *actual human workers* enumerated by the text of the 'transportation worker' exemption" and emphasized the Supreme Court's holding in *New Prime* that "the phrase 'contracts of employment' is intended to 'capture any contract for the performance of *work by workers.*'" *Id.* at 1196–97 (citations omitted) (emphasis and alterations in original).

I agree with the Ninth Circuit that commercial agreements between large corporations may not fall within the scope of Section 1, but I decline to adopt a bright-line rule that agreements involving business entities may never create a contract of employment. The facts of this case differ significantly from those addressed by the Ninth Circuit. Whereas that decision dealt with "sizable corporate entities," Martins and Overcomer are one and the same. Martins testified that Capstone

18

"require[d]" her to start Overcomer; that Overcomer did not have any other employees or independent contractors; and that payments were deposited in her personal bank account, not Overcomer's account. *See* [Doc. No. 48-1 at 6–9]. The creation of Overcomer seems to serve no purpose other than to contract around the FAA's exemption language, which the Ninth Circuit concedes is forbidden. *Fli-Lo Falcon, LLC*, 97 F.4th at 1197 (quoting *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 919 (9th Cir. 2020)) ("[W]e did reject Amazon's argument that parties could 'contract around the FAA's transportation worker exemption.'").

Thus, the Ninth Circuit's concern that a commercial entity is "not 'similar in nature' to the *actual human workers*" covered by the transportation worker exemption is inapplicable. *See Fli-Lo Falcon, LLC*, 97 F.4th at 1196; *see also Silva v. Schmidt Baking Distribution, LLC*, 162 F.4th 354, 362 (2d Cir. 2025) (citation omitted) ("Following the clear instruction of the Supreme Court in *New Prime*, we look to the substance of an agreement, not its formalities, to determine whether it is a 'contract of employment' for purposes of § 1 of the FAA."); *id.* at 360 (citation omitted) ("*New Prime*'s holding that 'contract of employment' was not, in 1925, 'a term of art bearing some specialized meaning,' but rather a capacious term referring to 'nothing more than an agreement to perform work' leaves little room to exclude a contract from the § 1 exception solely because it is between businesses.").

Where, as is the case here, a plaintiff is forced to create a sham corporation to facilitate a defendant's attempted runaround of the transportation worker exemption, it is appropriate to treat the individual plaintiff and her corporate entity interchangeably. *See Silva*, 162 F.4th at 362–63 (holding a contract between business entities was a contract of employment within the meaning of the FAA where the delivery drivers' corporate entities were "mere instrumentalities created at [the employer's] behest to dress individual 'contracts of employment' in the garb of commercial

transactions."); *see also Amos v. Amazon Logistics, Inc.*, 74 F.4th 591, 597 (4th Cir. 2023) (finding that the plaintiff corporation did not qualify for the transportation worker exemption in part because it was "not some legal fiction existing only to shield Amazon from unwanted liabilities"); *Tillman Transp., LLC v. MI Bus. Inc.*, 95 F.4th 1057, 1063 (6th Cir. 2024) (quoting this same language); *Fli-Lo Falcon, LLC*, 97 F.4th at 1202–03 (Thomas, dissenting) (acknowledging plaintiff's concern that a bright-line rule "would allow companies to contract around the FAA's exemption by forcing their transportation workers to create sham corporations, then contracting with those corporations rather than employing the workers directly").

### B.    Capstone's Motion to Transfer

Capstone seeks to transfer this matter to the United States District Court for the District of Delaware pursuant to the forum selection clause in the Priority Express Operating Agreement. *See generally* [Doc. Nos. 49–50].

Section 27.1 of the Priority Express Operating Agreement contains a choice of laws provision, arbitration clause, and forum selection clause, and it reads as follows:

> This agreement, as well as any claim or dispute arising from or in connection with this agreement, or with respect to any aspect of the relationship between the parties, will be governed by the laws of the United States and of Delaware, without regard to the choice-of-law rules of that or any other jurisdiction. The parties agree that any claim or dispute arising from or in connection with this agreement, or with respect to any aspect of the relationship between the parties, whether under federal, state, local, or foreign law (including but not limited to 49 C.F.R. Part 376), must be arbitrated pursuant to the arbitration agreement between the parties unless contractor has opted out of the same in accordance with its terms or the arbitration agreement does not cover the claim or dispute, in which case any such claim or dispute must be brought exclusively in the state or federal courts serving Wilmington, Delaware, the jurisdiction of which the parties hereby consent to.

[Doc. No. 9-1 at 14].

Capstone emphasizes the breadth of this forum-selection clause, which encompasses "any claim or dispute arising from or in connection with [the Priority Express Operating] Agreement, or with respect to any aspect of the relationship between the Parties," and argues that Martins' claim, which relates to her classification as an independent contractor, falls squarely within the scope of the clause. [Doc. No. 50 at 9–11].

Martins does not challenge the validity of the clause generally or that her Wage Act claim falls within its scope. *See generally* [Doc. No. 51]. Instead, she asserts the clause should not be enforced because neither Capstone nor Martins signed the Priority Express Operating Agreement and as such are not entitled to the rights and obligations under the contract. [*Id.* at 4]. She also argues that the forum selection clause cannot be enforced because the condition precedent for enforcement has not been established. [*Id.*]. And, finally, she argues that enforcement would violate public policy because there is no guarantee that a Delaware court would apply Massachusetts law. [*Id.*]. None of these arguments defeat the motion to transfer.

For the reasons previously stated in my decision on the motion to compel, Capstone and Priority Express constitute one interdependent entity, and Martins and Overcomer constitute another. Therefore, Martins' argument that she is not bound by and Capstone cannot enforce the forum selection clause because Overcomer (rather than Martins) and Priority Express (rather than Capstone) are the signatories to the agreement fails. *See Machado v. System4 LLC*, 471 Mass. 204, 211 (2015) (noting that there are no "uniformly articulated . . . standards for application of estoppel" and explaining that "a reviewing court may consider all of 'the relationships of persons, wrongs and issues' in the case," including the "substantially interdependent" nature and "concerted []conduct" of a signatory and its affiliated non-signatory).

Martins' argument that the condition precedent for enforcement of the forum selection clause has not been satisfied also fails. The parties seem to agree on the language constituting the condition precedent: "The parties agree that any claim or dispute arising from or in connection with this agreement, or with respect to any aspect of the relationship between the parties, whether under federal, state, local, or foreign law (including but not limited to 49 C.F.R. Part 376), must be arbitrated pursuant to the arbitration agreement between the parties unless contractor has opted out of the same in accordance with its terms or the arbitration agreement does not cover the claim or dispute." *See* [Doc. No. 51 at 5–7; Doc. No. 57 at 3–4]. Martins further concedes that the forum selection clause is triggered if the "arbitration agreement does not cover the claim or dispute." [Doc. No. 51 at 6]. However, the Priority Express Arbitration Agreement, like the Schedule B Arbitration Agreement, is governed by the FAA. [Doc. No. 24-1 at 1] ("The Parties agree this Arbitration Agreement is governed by the Federal Arbitration Act (9 U.S.C. § 1 *et seq.*) (FAA) and is not exempt from the FAA."). As previously explained, the Priority Express Operating Agreement constitutes a contract of employment within the meaning of Section 1. Therefore, the Priority Express Arbitration Agreement (like the Schedule B Arbitration Agreement) does not cover Martins' Wage Act claim, and, thus, the condition precedent is met.

Finally, Martins' public policy argument fails. Martins admits that the forum selection clause is bundled with a choice of law provision consenting to the application of Delaware law. [Doc. No. 51 at 7] ("The forum selection clause at issue contains a 'choice of law' provision. . . ."). She then argues that "Plaintiff may be required to pursue her wage claims under Delaware law if her case is moved to Delaware" and that application of Delaware law would violate Massachusetts' public policy because "Delaware has substantially weaker wage laws than Massachusetts." [Doc. No. 51 at 7–11].

22

The Massachusetts Supreme Court has stated that a forum selection clause which invokes a choice of law provision is unenforceable if its application "would effectively deprive the employee of substantive rights guaranteed by the Wage Act." *See Melia v. Zenhire, Inc.*, 462 Mass. 164, 173 (2012) (citations omitted) ("The forum selection clause would thus operate as a 'special contract,' exempting an employer from the requirements of the Wage Act . . . A forum selection clause that, in operation, would deprive an employee of substantive rights guaranteed by the Wage Act violates public policy and is unenforceable."). However, the Massachusetts Supreme Court also ruled that there is "a presumption that forum selection clauses are enforceable with respect to Wage Act claims." *Id.* at 181. "A party seeking to rebut this presumption must produce evidence indicating that (1) the Wage Act applies; (2) the selected forum's choice-of-law rules would select a law other than that of Massachusetts; and (3) application of the selected law would deprive the employee of a substantive right guaranteed by the Wage Act. On the introduction of such evidence, the proponent of the forum selection clause would retain the ultimate burden of demonstrating that the clause does not operate as a 'special contract.'" *Id.* (citation omitted).

Under this framework, the burden is on Martins to show that Delaware law would apply, not merely to compare the protections provided by the wage laws of each state. *See id.* Martins has made no such showing. *See generally* [Doc. No. 51]. Further, it seems unlikely that Delaware law would apply. *See Sunder Energy, LLC v. Jackson*, 305 A.3d 723, 747 (De. Ch. 2023) (overturned on other grounds) ("Delaware follows the Restatement (Second) of Conflict of Laws, and Delaware courts consequently will not enforce choice of law provisions when doing so would circumvent the public policy of another state that has a greater interest in the subject matter."); *Focus Financial Partners, LLC v. Holsopple*, 241 A.3d 784, 821 (De. Ch. 2020) ("Delaware has only a generalized interest in promoting freedom of contract . . . [W]hen a state has a specific

public policy interest in regulating a particular substantive area [like labor], that policy interest will typically override . . . a generalized interest in promoting freedom of contract."); *vMedex, Inc. v. TDS Operating, Inc.*, No. 18-cv-01662, 2020 WL 4925512, at *5 (D. Del. Aug. 21, 2020) ("Delaware courts will not uphold a choice-of-law provision that is contrary to the public policy of the state whose laws would otherwise govern."). Because Martins has not performed a choice of law analysis, performed a conflict of law analysis, or otherwise shown that a law other than that of Massachusetts would apply, she cannot show that enforcement of the forum selection clause violates public policy. *See generally* [Doc. No. 51].

## IV.  CONCLUSION

Accordingly, Capstone's motion to compel arbitration, [Doc. No. 47], is <u>DENIED</u>. However, it's motion to transfer this matter to the United States District Court for the District of Delaware, [Doc. No. 49], is <u>GRANTED</u>.

SO ORDERED.

/s/ Myong J. Joun
United States District Judge

24